J-S20012-21

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| JOHN EARL LEBO, JR. | : | |
| | : | |
| Appellant | : | No. 1538 MDA 2020 |

Appeal from the Judgment of Sentence Entered October 30, 2020
In the Court of Common Pleas of Dauphin County Criminal Division at
No(s): CP-22-MD-0000335-1984

BEFORE: NICHOLS, J., KING, J., and MUSMANNO, J.

MEMORANDUM BY NICHOLS, J.:           **FILED: AUGUST 24, 2021**

Appellant John Earl Lebo, Jr. appeals *pro se* from the judgment of

sentence of two consecutive sentences of life without parole (LWOP), after his

prior juvenile LWOP sentences were vacated. Appellant argues that the

Commonwealth failed to prove he was permanently incorrigible. We affirm

based on the trial court's opinion and deny Appellant's application for relief.

We state the facts and procedural history as presented by the trial court:

On January 31, 1984, [Appellant] was charged with two counts of
first-degree murder, two counts of kidnapping, indecent assault,
and theft by unlawful taking. [Appellant] was sixteen years old at
the time of the murders. His victims were his aunt, Lana Hahn,
and Ms. Hahn's two-year old child, Morgan Hahn. Acting alone,
[Appellant] killed them both after taking his victims from their
residence at gun point and making a long trek up a snow-covered
mountain. Prior to leaving the residence, [Appellant] attempted
to rape Ms. Hahn at knifepoint and attempted to do so a second
time after they reached the top of the mountain.

Following a guilty plea on October 5, 1984, the [trial court]
sentenced [Appellant] to two consecutive terms of life

imprisonment without parole. [Appellant did not appeal. Following a Post-Conviction Relief Act[1] petition, and p]ursuant to **Miller v. Alabama**, 567 U.S. 460 (2012), **Montgomery v. Louisiana**, 136 S. Ct. 718 (2016) and **Commonwealth v. Batts**, 163 A.3d 410 (Pa. 2017), [Appellant's] sentence was vacated and he was awarded a new sentencing hearing.

Trial Ct. Op., 2/25/21, at 1.

On October 30, 2020, the trial court conducted a sentencing hearing. The trial court summarized the extensive testimony presented at that hearing as follows:

The Commonwealth first called Trooper Daniel Wertz, a retired member of the Pennsylvania State Police who was involved in the investigation of the double murder leading to Appellant's arrest. Trooper Wertz testified that [Appellant] never expressed remorse for his crimes. [Appellant] demonstrated to Trooper Wertz how he shot two-year-old Morgan Hahn, telling the trooper that he blew him off of a rock. After relaying that description to the trooper, [Appellant] smiled at him. When asked why he shot the child, [Appellant] told Trooper Wertz that the boy was crying and making noise. Trooper Wertz further testified that [Appellant] had his victims make a 50-minute trek in very heavy snow from their home to the top of a mountain, where [Appellant] executed his plan to kill Ms. Hahn and her young son. On cross-examination Trooper Wertz acknowledged that he has had no interaction with [Appellant] since he was incarcerated.

John O'Brien, M.D., J.D., testified for the Commonwealth as an expert in forensic psychiatry. While Dr. O'Brien had requested an in-person examination of [Appellant], he was informed that [Appellant] was unavailable for an evaluation.[2] Nonetheless, Dr. O'Brien was able to gather sufficient information to render an opinion/report. Dr. O'Brien reviewed Dauphin County Children & Youth documents, [Appellant's] juvenile case record,

_____

[1] 42 Pa.C.S. §§ 9541-9546.

[2] Appellant's counsel declined to make Appellant available to Dr. O'Brien. N.T. Sentencing Hr'g, 10/30/20, at 39.

Pennsylvania State Police records, extensive presentence mental health evaluations, transcript of [Appellant's] sentencing hearing, correctional records from the Pennsylvania Department of Corrections [(DOC)], a juvenile lifer packet, numerous *pro se* filings signed by [Appellant], and a letter addressed to the District Attorney's Office from [Appellant's] sister, Bonnie Edwards.

The records make reference to [Appellant's] first episodes of misbehavior occurring in kindergarten, so over time he had been evaluated multiple times by a variety of professionals. When [Appellant] was eight years old, Dauphin County Children & Youth began supervision and the records make reference to his evaluation in Kindergarten, and a representation by his mother that he was unmanageable at home. [Appellant] had numerous residential and treatment and therapeutic placements between 1980 and 1983 when he was between 13 and 16 years old. His juvenile case record revealed numerous charges and behavioral deterioration between the ages of 12 and 14. [Appellant] was discharged from a program to live with his paternal grandmother in July of 1983. His behavior appeared to be improving during that time until January of 1984, when he committed the murders. [Appellant's] police records between 1979 and 1981 included theft, arson, criminal mischief, burglary, burglary associated with home invasion, and attempted burglary.

Dr. O'Brien testified that while he reviewed extensive and detailed records and evaluations up until the crimes at issue, he was surprised at how little information was included in [Appellant's DOC] records since [Appellant's] incarceration in 1984. Notwithstanding the nature and gravity of his crimes, [Appellant] has undergone very little evaluation and treatment. Dr. O'Brien also noted that there is a great deal of material that has been generated by [Appellant] himself, including a vast amount of *pro se* filings, the most salient feature being that he alleges his innocence in those materials.

Dr. O'Brien pointed out that there is a striking consensus in all of [Appellant]'s evaluations that he does not have a psychiatric condition or illness. While there is evidence to support borderline intellectual functioning, the pleadings do not depict [Appellant] as incapable of making an argument or coming to a point. However, the records do repeatedly make reference to emotional detachment, marginal adjustment, poor response to placements, consistent minimization of responsibility, and no capacity for

empathy. Dr. O'Brien opined that these traits are all consistent with an individual who has distanced himself actively from the offense and not really participated in anything focused on addressing the issues underlying it.

In terms of incorrigibility, one of the things Dr. O'Brien found most striking is that [Appellant] has been repeatedly documented to be unresponsive to efforts to treat him, and the word "incorrigibility" actually appears in his records on a number of occasions. The refractory quality of [Appellant's] behavioral problems is documented across the board in every setting - parents, foster care placements, juvenile placements, and therapeutic juvenile placements. His behavior was provocative and even sadistic. . . . He has participated in work while [in prison], enjoys making money, and has demonstrated himself to be able to behave. Dr. O'Brien testified that [Appellant] was not being pushed to focus on engaging himself in participating in programming of a therapeutic nature appropriate for his history and was able to remain complacent without anyone prodding him to do otherwise. [Dr. O'Brien also testified that it] is also possible that [Appellant's] behavior in prison is a manifestation of the benefits of structure and having an easy route in terms of not dealing with the issues related to his offenses. Dr. O'Brien relayed that it is not surprising for him to see a case where an inmate has a terrible criminal record and then they get incarcerated and they do not behave as they behaved outside; they adjust well to prison, possibly in light of the structure. Given these considerations, including the fact that the crimes reflect a shocking degree of depravity and were significantly egregious, Dr. O'Brien's conclusion to a reasonable degree of medical certainty is that [Appellant] has not demonstrated himself to be capable of rehabilitation.

Dr. Susan Rushing, [Esq.,] also a forensic psychiatric expert, was called as a witness for [Appellant]. Dr. Rushing met with [Appellant] and also reviewed the extensive records that were available. Like Dr. O'Brien, Dr. Rushing noted very little in terms of [Appellant's] files during his term of incarceration. Prior to his imprisonment, Dr. Rushing testified as to [Appellant's] intellectual limitations and repeated findings of his lack of ability to relate to others, lack of attachment to people who should have been parental figures in his life, along with traits described as autistic qualities. There was social deprivation from a very young age. [Appellant's] mom was intellectually disabled and his father was in and out of drug rehabilitation. Moreover, the records contain

references that [Appellant] was subject to both physical and sexual abuse. Unlike Dr. O'Brien, Dr. Rushing does not view [Appellant's] incarceration time as a period of lack of improvement. Her interpretation is that [Appellant] was put into a structured environment with appropriate support in terms of being fed and given an opportunity to work, which he did.

On cross[-]examination, Dr. Rushing was questioned about [Appellant's] risk of future danger, as suggested in [Appellant's] sister's letter to the District Attorney's Office. In such letter, Bonnie Edwards asked that her brother not be allowed to go free, that these crimes were premeditated and involved his own family[:] "Please, I beg and implore you to please reconsider letting him free. He's been in jail for over 30 years. He has no family. He has no one on the outside. He will not become anything but do more crime." Moreover, a summary update from the DOC on January 10, 2014 was referenced. Specifically, [Appellant] gave a summary of the killing and described the sexual aspect of the offense and murdering of both victims, indicating he shot the child because the child started to cry. Dr. Rushing concluded to a reasonable degree of medical certainty that, having not seen continued violence after incarceration, [Appellant's] record does not speak to someone who is permanently incorrigible.

*Id.* at 3-7 (citations omitted and formatting altered). The Commonwealth requested that the trial court reimpose consecutive life sentences. N.T. Sentencing Hr'g, 10/30/20, at 77-78.

At the conclusion of the hearing, the trial court again sentenced Appellant to two consecutive terms of LWOP. The trial court reasoned, among other things, that Appellant is permanently incorrigible. *Id.* at 85. Appellant timely filed a counseled post-sentence motion, which the trial court denied on November 16, 2020.

Appellant's counsel filed a timely notice of appeal and a timely court-ordered Pa.R.A.P. 1925(b) statement, which claimed that the Commonwealth

failed to present sufficient evidence that he is permanently incorrigible and that the trial court abused its discretion by imposing sentences of LWOP. The trial court filed a responsive Rule 1925(b) decision addressing Appellant's claims.

Meanwhile, Appellant requested, and the trial court held, a **Grazier**[3] hearing. On February 25, 2021, the trial court granted Appellant's request to represent himself *pro se*, and he subsequently filed a *pro se* appellate brief with this Court. On August 2, 2021, Appellant subsequently filed an application for relief in this Court requesting that this Court turn over various documents in his record. Appl. for Relief, 8/2/21.

We paraphrase the issues raised in Appellant's *pro se* appellate brief, which we have reordered, as follows:[4]

1. Appellant was never arrested or indicted by a grand jury.

2. Appellant has been falsely imprisoned because the [DOC] did not receive a signed BC-300B form.[5]

---

[3] **Commonwealth v. Grazier**, 713 A.2d 81 (Pa. 1998).

[4] Appellant's *pro se* brief violates numerous Rules of Appellate Procedure, including a failure to include a statement of questions involved under Pa.R.A.P. 2116. We decline to find waiver, however, as we are able to discern Appellant's arguments.

[5] Initially, Appellant's record reflects a signed BC-300B form, which is now known as a DC-300B form. Appellant appears to argue that because the DOC did not receive the form from the trial court per 42 Pa.C.S. § 9764, the DOC has no authority to detain him. Appellant's Brief at 2 (unpaginated). In
*(Footnote Continued Next Page)*

- 6 -

3. The record establishes he was found guilty by a jury on the same day he pled guilty, which Appellant contends is impossible.

4. The criminal information was not signed by the district attorney.

5. Appellant appears to argue he should have been tried by the juvenile court.

6. The Commonwealth failed to establish Appellant was permanently incorrigible or unable to be rehabilitated.

Appellant's Brief at 1-7 (unpaginated).

We need not summarize Appellant's arguments in support of his initial five issues. It is well-settled that "[a]ny issues not raised in a Pa.R.A.P. 1925(b) statement will be deemed waived." *Commonwealth v. Lord*, 719 A.2d 306, 309 (Pa. 1998). Here, Appellant failed to raise his initial five issues in his Rule 1925(b) statement, and therefore has waived them for appellate review. *See id.*

_____

*Joseph v. Glunt*, 96 A.3d 365 (Pa. Super. 2014), this Court rejected a similar argument:

The language and structure of section 9764, viewed in context, make clear that the statute pertains not to the DOC's authority to detain a duly-sentenced prisoner, but, rather, sets forth the procedures and prerogatives associated with the transfer of an inmate from county to state detention. . . . Moreover, section 9764 neither expressly vests, nor implies the vestiture, in a prisoner of any remedy for deviation from the procedures prescribed within.

*Id.* at 371 (footnote omitted); *see generally* 42 Pa.C.S. § 9764. Therefore, although we hold, *infra*, that Appellant waived this issue, it lacks merit.

In support of his last issue, Appellant has argued, in a single sentence, that under **Miller**, the Commonwealth "never proved that [he] was ever permanently incorrigible or unable to be rehabilitated . . . ."[6] Appellant's Brief at 6 (unpaginated).

"A claim challenging a sentencing court's legal authority to impose a particular sentence presents a question regarding the legality of the sentence."[7]  **Commonwealth v. Clary**, 226 A.3d 571, 580-81 (Pa. Super. 2020) (citation omitted).  Our Supreme Court has explained:

> [W]e must review the sentencing court's legal conclusion that [the defendant] is eligible to receive a sentence of life without parole pursuant to a *de novo* standard and plenary scope of review.

---

[6] The Commonwealth did not address the merits and instead argued that Appellant waived all of his issues by failing to file a brief that conformed with the Rules of Appellate Procedure.  Commonwealth's Brief at 4.

[7] "[I]n the absence of the sentencing court reaching a conclusion, supported by competent evidence, that the defendant will forever be incorrigible, without any hope for rehabilitation, a life-without-parole sentence imposed on a juvenile is illegal, as it is beyond the court's power to impose."  **Batts**, 163 A.3d at 435, *abrogated on other grounds by* **Jones v. Mississippi**, 141 S. Ct. 1307 (2021).  "The **Jones** Court confirmed that mandatory sentences of life without the possibility [of parole] for juvenile offenders violate the cruel and unusual punishment clause of the Eighth Amendment of the United States Constitution, but held that sentencing schemes which allow the discretionary imposition of life sentences pass constitutional muster and need not require a separate factual finding of permanent incorrigibility before doing so." **Commonwealth v. McGrath**, ____ A.3d ____, 2021 WL 2641915, *2 n.1 (Pa. Super. 2021).  We note, however, that **Jones** did not prevent "the States from imposing additional sentencing limits in cases involving defendants under 18 convicted of murder," and permits States to "require sentencers to make extra factual findings before sentencing an offender under 18 to life without parole." **Jones**, 141 S. Ct. at 1323.  Therefore, **Batts** continues to bind this Court when the Commonwealth requests an LWOP sentence for a juvenile. **McGrath**, 2021 WL 2641915 at *4.

Because this legal conclusion is premised upon the presentation of testimony and the sentencing court's credibility determinations, it presents a mixed question of fact and law. In such circumstances, we defer to the findings of fact made by the sentencing court as long as they are supported by competent evidence, but give no deference to that court's legal conclusions.

*Batts*, 163 A.3d at 435-36 (citations omitted and formatting altered).

The *McGrath* Court explained that in *Batts*, our Supreme Court

concluded that to effectuate the mandate of *Miller* and [*Montgomery*,] it would provide a procedural safeguard to ensure that LWOP sentences are meted out only to the rarest of juvenile offenders whose crimes reflect permanent incorrigibility by recognizing a presumption against the imposition of a LWOP sentence for a juvenile offender. Therefore, if the Commonwealth seeks a LWOP sentence for a juvenile offender, it must prove beyond a reasonable doubt that the offender exhibits such irretrievable depravity that rehabilitation is impossible. If the Commonwealth satisfies its burden of proof, the sentencing court has discretion to impose a LWOP sentence upon the juvenile offender.

When the Commonwealth requests a sentence of LWOP, the sentencing court must consider the *Miller* and Section 1102.1(d) factors on the record, before imposing a sentence. If the court imposes the requested LWOP sentence, it must find that the juvenile offender is permanently incorrigible and that rehabilitation would be impossible.

*McGrath*, 2021 WL 2641915 at *3-4 (citations and footnotes omitted and formatting altered).

The Section 1102.1(d) factors follow:

**(d) Findings.—**In determining whether to impose a sentence of life without parole under subsection (a), the court shall consider and make findings on the record regarding the following:

(1) The impact of the offense on each victim, including oral and written victim impact statements made or submitted by family members of the victim detailing the physical, psychological and

economic effects of the crime on the victim and the victim's family.  A victim impact statement may include comment on the sentence of the defendant.

(2) The impact of the offense on the community.

(3) The threat to the safety of the public or any individual posed by the defendant.

(4) The nature and circumstances of the offense committed by the defendant.

(5) The degree of the defendant's culpability.

(6) Guidelines for sentencing and resentencing adopted by the Pennsylvania Commission on Sentencing.

(7) Age-related characteristics of the defendant, including:

(i) Age.

(ii) Mental capacity.

(iii) Maturity.

(iv) The degree of criminal sophistication exhibited by the defendant.

(v) The nature and extent of any prior delinquent or criminal history, including the success or failure of any previous attempts by the court to rehabilitate the defendant.

(vi) Probation or institutional reports.

(vii) Other relevant factors.

18 Pa.C.S. § 1102.1.

After careful review of the record, including the resentencing transcript, we conclude that the trial court thoroughly reviewed the record and considered the testimony and evidence introduced at the resentencing hearing.  *See* Trial

Ct. Op. at 1-12. Because the record supports the trial court's determination that the Commonwealth proved, via competent evidence, that Appellant was permanently incorrigible, we affirm the judgment of sentence based on the trial court's well-reasoned opinion. *See id.*; *Batts*, 163 A.3d at 435-36.

Judgment of sentence affirmed. Appellant's application for relief denied.

Judge Musmanno joins the memorandum.

Judge King concurs in the result.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 8/24/2021



COMMONWEALTH OF PENNSYLVANIA    : IN THE COURT OF COMMON PLEAS
                                    : DAUPHIN COUNTY, PENNSYLVANIA
                                    :

                                    :

                vs.                    : NO. 0335-MD-1984
                                    :

                                    :

JOHN EARL LEBO, JR.                :

## MEMORANDUM OPINION

On January 31, 1984, Defendant John Earl Lebo, Jr. was charged with two counts of first-degree murder, two counts of kidnapping, indecent assault, and theft by unlawful taking. Defendant was sixteen years old at the time of the murders. His victims were his aunt, Lana Hahn, and Ms. Hahn's two-year old child, Morgan Hahn. Acting alone, Defendant killed them both after taking his victims from their residence at gun point and making a long trek up a snow-covered mountain. Prior to leaving the residence, Defendant attempted to rape Ms. Hahn at knifepoint and attempted to do so a second time after they reached the top of the mountain.

Following a guilty plea on October 5, 1984, the Honorable Warren G. Morgan sentenced Defendant to two consecutive terms of life imprisonment without parole. Pursuant to *Miller v. Alabama,* 567 U.S. 460 (2012), *Montgomery v. Louisiana,* 136 S.Ct. 718 (2016) and *Commonwealth v. Batts,* 163 A.3d 410 (Pa. 2017), Defendant's sentence was vacated and he was awarded a new sentencing hearing.

A hearing was held on October 30, 2020, following which this Court reimposed two consecutive life-without-parole sentences. This appeal followed. In his statement of matters complained of on appeal, Defendant raises the following issues:

1

10-13

1. The Commonwealth presented insufficient evidence to prove beyond a reasonable doubt the necessary factual predicates set forth in *Miller*, *Montgomery*, and *Batts*.

2. Even if the Court was justified in finding that the Commonwealth met its burden of proof, it is left to the sentencing court's discretion whether to impose a life-without-parole sentence or to instead impose a sentence that would allow the juvenile to have an opportunity for parole consideration pursuant to *Batts*. The Court's sentence was so manifestly excessive as to constitute an abuse of discretion, was not consistent with the protection of the public, the gravity of the offenses, and Defendant's rehabilitative needs.

In *Miller v. Alabama*, 567 U.S. 460 (2012), the United States Supreme Court held that sentences of "mandatory life without parole for those under the age of 18 at the time of their crimes violates the Eighth Amendment's prohibition on 'cruel and unusual punishments.'" *Id.* at 465. Subsequently, in *Montgomery v. Louisiana*, 136 S. Ct. 718 (2016), the Supreme Court concluded that the holding of *Miller* applied retroactively to juvenile offenders on collateral review. *Id.*

In *Commonwealth v. Batts*, 66 A.3d 286 (Pa. 2013) ("*Batts I*"), the Pennsylvania Supreme Court addressed for the first time after *Miller* the sentencing of a juvenile offender convicted of first-degree murder. Noting that the Court in *Miller* declined to place a "categorical ban" on life-without-parole sentences for juvenile offenders, our Supreme Court in *Batts I* held that juvenile offenders convicted of first-degree murder could be subject to a life-without-parole sentence only after the sentencing court considered the criteria outlined in *Miller*. *Id.* at 296-99. Upon resentencing, Batts once again received a sentence of life imprisonment without the possibility of parole. He would go on to appeal this sentence to the Pennsylvania Supreme Court in *Commonwealth v. Batts*, 163 A.3d 410 (Pa. 2017) ("*Batts II*").

2

With respect to the protocol for resentencing juvenile offenders convicted of first-degree murder, the *Batts II* Court first determined that "a faithful application of the holding in *Miller*, as clarified in *Montgomery*, requires the creation of a presumption against sentencing a juvenile offender to life in prison without the possibility of parole." *Id.* at 452. The Court reasoned that such a presumption stemmed from *Miller's* holding that "life without parole is an excessive sentence for children whose crimes reflect transient immaturity" and that this, according to *Montgomery*, means that only the rarest of juvenile offenders are eligible to receive a sentence of life without the possibility of parole. *Batts II, supra,* at 452. Second, our Supreme Court held that "to overcome the presumption against the imposition of a sentence of life without parole for a juvenile offender, the Commonwealth must prove that the juvenile is constitutionally eligible for the sentence beyond a reasonable doubt." *Id.* at 455. The Court explained that to rebut the presumption against a life-without-parole sentence, the Commonwealth must prove, "beyond a reasonable doubt, that the juvenile offender is permanently incorrigible and thus is unable to be rehabilitated." *Id.* at 459. The Court reasoned that the high burden of proof is necessary given that the United States Supreme Court clearly instructed that a decision that an offender is one of the rare and uncommon juveniles permitted to constitutionally receive a life sentence without parole must be made with near certainty. *Id.* at 454-55.

In light of the foregoing standards, we summarize the testimony garnered at Defendant Lebo's October 30, 2020 sentencing hearing. The Commonwealth first called Trooper Daniel Wertz, a retired member of the Pennsylvania State Police who was involved in the investigation of the double murder leading to Defendant's arrest. [Sentencing Hearing, October 30, 2020, Notes of, pp Testimony. 8-9]. Trooper Wertz testified that Defendant never expressed remorse for his crimes. Defendant demonstrated to Trooper Wertz how he shot two-year-old Morgan

3

Hahn, telling the trooper that he blew him off of a rock. After relaying that description to the trooper, Defendant smiled at him. When asked why he shot the child, Defendant told Trooper Wertz that the boy was crying and making noise. [N.T., 10-30-20, pp. 11-12]. Trooper Wertz further testified that Defendant had his victims make a 50-minute trek in very heavy snow from their home to the top of a mountain, where Defendant executed his plan to kill Ms. Hahn and her young son. [N.T., 10-30-20, pp. 12-13]. On cross-examination Trooper Wertz acknowledged that he has had no interaction with Defendant since he was incarcerated. [N.T., 10-30-20, p. 13].

John O'Brien, M.D., J.D., testified for the Commonwealth as an expert in forensic psychiatry. While Dr. O'Brien had requested an in-person examination of Defendant, he was informed that Defendant was unavailable for an evaluation. Nonetheless, Dr. O'Brien was able to gather sufficient information to render an opinion/report. [N.T., 10-30-20, pp. 14-20]. Dr. O'Brien reviewed Dauphin County Children & Youth documents, Defendant's juvenile case record, Pennsylvania State Police records, extensive presentence mental health evaluations, transcript of Defendant's sentencing hearing, correctional records from the Pennsylvania Department of Corrections, a juvenile lifer packet, numerous *pro se* filings signed by Defendant, and a letter addressed to the District Attorney's Office from Defendant's sister, Bonnie Edwards. [N.T., 10-30-20, pp. 21-24].

The records make reference to Defendant's first episodes of misbehavior occurring in kindergarten, so over time he had been evaluated multiple times by a variety of professionals. When Defendant was eight years old, Dauphin County Children & Youth began supervision and the records make reference to his evaluation in Kindergarten, and a representation by his mother that he was unmanageable at home. Defendant had numerous residential and treatment and therapeutic placements between 1980 and 1983 when he was between 13 and 16 years old.

4

[N.T., 10-30-20, p. 21]. His juvenile case record revealed numerous charges and behavioral deterioration between the ages of 12 and 14. Defendant was discharged from a program to live with his paternal grandmother in July of 1983. His behavior appeared to be improving during that time until January of 1984, when he committed the murders. Defendant's police records between 1979 and 1981 included theft, arson, criminal mischief, burglary, burglary associated with home invasion, and attempted burglary. [N.T., 10-30-20, pp. 22-23].

Dr. O'Brien testified that while he reviewed extensive and detailed records and evaluations up until the crimes at issue, he was surprised at how little information was included in Defendant's Department of Corrections' records since Defendant's incarceration in 1984. Notwithstanding the nature and gravity of his crimes, Defendant has undergone very little evaluation and treatment. Dr. O'Brien also noted that there is a great deal of material that has been generated by Defendant himself, including a vast amount of *pro se* filings, the most salient feature being that he alleges his innocence in those materials. [N.T., 10-30-20, pp. 24-26].

Dr. O'Brien pointed out that there is a striking consensus in all of Defendant's evaluations that he does not have a psychiatric condition or illness. While there is evidence to support borderline intellectual functioning, the pleadings do not depict Defendant as incapable of making an argument or coming to a point. However, the records do repeatedly make reference to emotional detachment, marginal adjustment, poor response to placements, consistent minimization of responsibility, and no capacity for empathy. Dr. O'Brien opined that these traits are all consistent with an individual who has distanced himself actively from the offense and not really participated in anything focused on addressing the issues underlying it. [N.T., 10-30-20, pp. 26-28].

5

In terms of incorrigibility, one of the things Dr. O'Brien found most striking is that Defendant has been repeatedly documented to be unresponsive to efforts to treat him, and the word "incorrigibility" actually appears in his records on a number of occasions. [N.T., 10-30-20, p. 30]. The refractory quality of Defendant's behavioral problems is documented across the board in every setting – parents, foster care placements, juvenile placements, and therapeutic juvenile placements. His behavior was provocative and even sadistic. So the question becomes what does one make of Defendant's complacency during the years in the penitentiary? He has participated in work while there, enjoys making money, and has demonstrated himself to be able to behave. Dr. O'Brien testified that Defendant was not being pushed to focus on engaging himself in participating in programming of a therapeutic nature appropriate for his history and was able to remain complacent without anyone prodding him to do otherwise. It is also possible that Defendant's behavior in prison is a manifestation of the benefits of structure and having an easy route in terms of not dealing with the issues related to his offenses. [N.T., 10-30-20, pp. 31-33]. Dr. O'Brien relayed that it is not surprising for him to see a case where an inmate has a terrible criminal record and then they get incarcerated and they do not behave as they behaved outside; they adjust well to prison, possibly in light of the structure. [N.T., 10-30-20, p. 45]. Given these considerations, including the fact that the crimes reflect a shocking degree of depravity and were significantly egregious, Dr. O'Brien's conclusion to a reasonable degree of medical certainty is that Defendant has not demonstrated himself to be capable of rehabilitation. [N.T., 10-30-20, pp. 36-37].

Dr. Susan Rushing, also a forensic psychiatric expert, was called as a witness for Defendant. [N.T., 10-30-20, p. 46]. Dr. Rushing met with Defendant and also reviewed the extensive records that were available. Like Dr. O'Brien, Dr. Rushing noted very little in terms of

6

Defendant's files during his term of incarceration. Prior to his imprisonment, Dr. Rushing testified as to his intellectual limitations and repeated findings of his lack of ability to relate to others, lack of attachment to people who should have been parental figures in his life, along with traits described as autistic qualities. [N.T., 10-30-20, pp. 52-54]. There was social deprivation from a very young age. Defendant's mom was intellectually disabled and his father was in and out of drug rehabilitation. Moreover, the records contain references that Defendant was subject to both physical and sexual abuse. [N.T., 10-30-20, pp. 55-56]. Unlike Dr. O'Brien, Dr. Rushing does not view Defendant's incarceration time as a period of lack of improvement. Her interpretation is that Defendant was put into a structured environment with appropriate support in terms of being fed and given an opportunity to work, which he did. [N.T., 10-30-20, pp. 58-59].

On cross examination, Dr. Rushing was questioned about Defendant's risk of future danger, as suggested in Defendant's sister's letter to the District Attorney's Office. In such letter, Bonnie Edwards asked that her brother not be allowed to go free, that these crimes were premeditated and involved his own family. "Please, I beg and implore you to please reconsider letting him free. He's been in jail ... for over 30 years. He has no family. He has no one on the outside. He will not become anything but do more crime." [N.T., 10-30-20, p. 70]. Moreover, a summary update from the DOC on January 10, 2014 was referenced. Specifically, Defendant gave a summary of the killing and described the sexual aspect of the offense and murdering of both victims, indicating he shot the child because the child started to cry. [N.T., 10-30-20, p. 71]. Dr. Rushing concluded to a reasonable degree of medical certainty that, having not seen continued violence after incarceration, Defendant's record does not speak to someone who is permanently incorrigible. [N.T., 10-30-20, pp. 61-64].

At the conclusion of the hearing, this Court sentenced Defendant to life imprisonment for the death of Ms. Hahn and a consecutive life imprisonment sentence for the death of Morgan Hahn. In support of this decision, this Court reasoned as follows:

> The criminal actions and acts that took place here cry out for the imposition of life sentences. There is no doubt. However, that is not alone what is to be weighed here today.
>
> It has been sent back to the Court because at the time these actions took place, the individual was a juvenile; specifically, 16 years of age. In weighing the expert reports and the testimony and review of other items placed in evidence, it is clear that the defendant herein experienced such trauma that many of us are fortunate not to have to undergo in their lifetimes, and the trauma to his life and what he experienced as a child greatly affected him and his development....
>
> [W]hile we feel great sympathy into what he had experienced and observed in his developmental years...we cannot lose fact of what that then created in his development as an individual.....
>
> I want to reemphasize, there is a shocking degree of depravity that took place in the entire criminal episode. It was not something that was just a spur of the moment, a lapse in judgment, a juvenile lack of development, a reaction to peers, an emotional rush that took place that caused a child to just react badly.
>
> The degree of the actions and the continuation of that criminal episode does, in fact, speak greatly to the development of that individual at that time. The incorrigible child turned into an incorrigible young man....
>
> I would be remiss if I didn't comment, I believe, on a quote that was made by Dr. O'Brien of the manifestation of sadistic feelings. And that underplays, because when the cases are being sent back for review, the Courts have to struggle with the developmental mind of the juvenile and how that changes over time.
>
> So that change is always perceived to take place in juveniles as they go into adult development. But, again, it's what are we watching in that development that truly comes into play, because there was, again, no peer pressure here. These actions were, I believe, different from what a lot of the resentencings of juveniles-now-turned-adult become an assessment process of the initial act, the development, and the rehabilitation that can take place for the future.
>
> The interesting note...is the lack – after initial write-ups...of any write-ups for violence once in the prison setting, because we saw in child placements...the actions that would take place, and that were promulgated...in those settings did not repeat itself. And so one could interpret it possibly, as his development and

8

rehabilitation had taken place and there has been an adjustment by the defendant to the prison setting.

But I harken back to the expert reports made...in '84...the projection of the rehabilitative possibilities for the defendant.

And, granted, include in this area are some learning disability issues. The mere fact that there were no write-ups in prison does not indicate to this Court that there has been an appreciable manner or change or rehabilitation that would evidence a change from those findings made earlier by the doctors and are brought true now.

And, therefore, in assessing the status of the defendant as it exists, the same exact need to protect society that existed with the sentence of Judge Warren Morgan I do not find has changed.

Back then there was a finding of permanent incorrigibility – although those words were not used by Judge Morgan, although they were not used by those assessments – exists, and have not altered this Court's mind to today[.]

And being irreparably depraved, given the actions and the involvement that took place there at the time of these two murders, and any advancements that have happened in the prison setting for the defendant, I see no appreciable change or rehabilitation, just adjustment.

So, therefore, although I initially sat and was trying to determine what sentence would be appropriate, after all the testimony, I believe the initial one was correct.

[N.T., 10-30-20, pp. 82-85].

Defendant's first issue on appeal challenges the Commonwealth's evidence; specifically, that there was insufficient evidence to prove beyond a reasonable doubt that the imposition of consecutive life sentences was justified under the pertinent case law. Our appellate courts' standard of review is well-settled.

In reviewing a sufficiency claim, we consider the entirety of the evidence introduced, including improperly admitted evidence. *Commonwealth v. Watley*, 81 A.3d 108, 113 (Pa. Super. 2013) (*en banc* ). We view that evidence in a light most favorable to the Commonwealth, drawing all reasonable inferences in favor of the Commonwealth. *Id.* The evidence "need not preclude every possibility of innocence and the fact-finder is free to believe all, part, or none of the evidence presented." *Id.* Only where "the evidence is so weak and inconclusive that, as a matter of law, no probability of fact can be drawn from the combined circumstances[,]" is a defendant entitled to relief. *Id.* We do not "re-weigh the

9

evidence and substitute our judgment for that of the fact-finder." *Id.* As the question of the sufficiency of the evidence is one of law, we consider the evidence *de novo. Commonwealth v. Sanchez,* 614 Pa. 1, 36 A.3d 24, 37 (2011).

*Commonwealth v. Ford,* 141 A.3d 547, 552-53 (Pa. Super. 2016).

As recognized by both Dr. O'Brien and Dr. Rushing, the numerous records in this case make repeated reference to Defendant's emotional detachment and no capacity for empathy. It is not disputed that the crimes at issue reflect an appalling degree of depravity and were exceedingly egregious. Dr. O'Brien testified to Defendant's incorrigibility, pointing out the fact that Defendant's records reflect the term being used on several occasions. Moreover, he recognized Defendant's behavior in all settings prior to imprisonment as provocative and sadistic. It is Dr. O'Brien's opinion, and this Court agrees, that Defendant's acceptable behavior while incarcerated speaks more to the fact that he has adjusted to the structure of prison life as opposed to reflecting rehabilitation or the possibility of rehabilitation. Defendant's incorrigibility, reflected in years of behavioral documentation and the opinion of the Commonwealth's expert, has not been shown to have been altered by the fact that he has had only minimal negative write-ups in prison. Defendant has done very little, if anything, to avail himself of any therapeutic programs to deal with the underlying issues leading to his horrific crimes. As reflected by the evidence presented, this is not a situation whereby Defendant's crimes reflected a "transient immaturity" as set forth in *Miller.* Again, these crimes were not carried out during an emotional lapse in judgment at the spur of the moment, nor were they influence by peer pressure. Dr. O'Brien clearly stated his conclusion that Defendant has not demonstrated that he is capable of rehabilitation and the evidence of record is plainly sufficient. *Ford, supra.* While the exact language in *Batts II* might not have been utilized, the determination by Dr. O'Brien that Defendant is incapable of rehabilitation, is incorrigible, and

10

has well-documented years of provocative, sadistic, and depraved behavior, reflects that

Defendant is indeed one of the rare and uncommon juveniles who is constitutionally eligible for

a reimposed life sentence. Defendant's first issue must fail.

In his remaining issue, Defendant asserts his sentence is excessive and an abuse of this

Court's discretion. In addition to asserting that his sentence is manifestly excessive, Defendant

claims that the life-without-parole consecutive sentences it is not consistent with the protection

of the public, the gravity of the offenses, and his rehabilitative needs.

Sentencing is a matter vested in the sound discretion of the sentencing judge, and a

sentence will not be disturbed on appeal absent a manifest abuse of discretion. *Commonwealth*

*v. Raven*, 97 A.3d 1244, 1253 (Pa. Super. 2014).

> [A]n abuse of discretion is more than a mere error of judgment, thus, a
> sentencing court will not have abused its discretion unless the record discloses
> that the judgment exercised was manifestly unreasonable, or the result of
> partiality, prejudice, bias or ill-will. In more expansive terms, ….An abuse of
> discretion may not be found merely because an appellate court might have
> reached a different conclusion, but requires a result of manifest unreasonableness,
> or partiality, prejudice, bias, or ill-will, or such lack of support so as to be clearly
> erroneous.
>
> The rationale behind such broad discretion and the concomitantly
> deferential standard of appellate review is that the sentencing court is in the best
> position to determine the proper penalty for a particular offense based upon an
> evaluation of the individual circumstances before it. Simply stated, the sentencing
> court sentences flesh-and-blood defendants and the nuances of sentencing
> decisions are difficult to gauge from the cold transcript used upon appellate
> review. Moreover, the sentencing court enjoys an institutional advantage to
> appellate review, bringing to its decisions an expertise, experience, and judgment
> that should not be lightly disturbed. Even with the advent of the sentencing
> guidelines, the power of sentencing is a function to be performed by the
> sentencing court. Thus, rather than cabin the exercised of a sentencing court's
> discretion, the guidelines merely inform the sentencing decision.

*Commonwealth v. Walls*, 592 Pa. 557, 564-70, 926 A.2d 957, 961-65 (2007) (internal quotation

marks, footnotes, and citations omitted). A sentencing court need not undertake a lengthy

discourse for its reasons for imposing a sentence. *Commonwealth v. Crump*, 995 A.2d 1280,

11

1283 (Pa. Super. 2010). Rather, the record as a whole must reflect the sentencing court's consideration of the facts of the case and the defendant's character. *Id.* It is presumed that where a pre-sentence report exists the sentencing court is aware of relevant information concerning the defendant's character, and considered that information along with mitigating statutory factors, when imposing its sentence. *Commonwealth v. Devers,* 519 Pa. 88, 546 A.2d 12 (1988); *see also Commonwealth v. Bonner,* 135 A.3d 592, 605 (Pa. Super. 2016) (A presentence investigation report constitutes the record and speaks for itself.).

This Court did, in fact, engage in a lengthy discourse in support of the sentence imposed. As evidenced by the resentencing hearing, this Court had access to extensive records, pre-sentencing memoranda, and the like. *Devers, supra.* Defendant's sentence falls within the sentencing guidelines and, as reflected in our disposition of Defendant's first issue on appeal, is not unreasonable given the gravity of the offense, protection of the public, and Defendant's rehabilitative needs. We have already concluded that Defendant cannot be rehabilitated. Given the heinous circumstances, it would be difficult to envision a crime more worthy of consecutive life sentences. Such punishment is not manifestly unreasonable, the result of partiality, prejudice, bias, or ill will; there was no abuse of discretion. *Walls, supra.* In light of the foregoing, Defendant's judgment of sentence should be affirmed.

BY THE COURT:

Scott Arthur Evans, Judge

DATED: 2/24/21

Distribution: 2/25/21 @ 1:57pm
District Attorney's Office Io
James J. Karl, Esq., Public Defender's Office Io
Prothonotary, Superior Court of Pennsylvania mail
Chambers of Judge Scott Arthur Evans Io

John Lebo, Dauphin County Prison mail

13